FILED

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2013 OCT 28 P 4:29

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| Jeffrey Kantor ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:13 CV 1343 |
| ) | GBL/IDD |
| Solution Technology Systems, Inc. ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

### I. Preliminary Statement

This is a civil action wherein the plaintiff, Jeffrey Kantor (the "plaintiff"), alleges that his employer, Solution Technology Systems, Inc., a Virginia corporation ("STSI"), engaged in retaliation against the plaintiff by engaging in group stalking that included repeating back the plaintiff's private information, including a phone call between himself and the EEOC and an email between him and his attorney in regards to a prior EEOC complaint against the plaintiff's former employer. At the plaintiff's former employer Kantor alleged he was discriminated against based on religion and fired after reporting the discrimination. At STSI, Kantor contacted the FBI to complain his private information being regurgitated back to him, the FBI contacted the EPA, the EPA contacted STSI, and Kantor was almost immediately fired. The plaintiff further alleges that by engaging in this action the defendant violated Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq. which provides relief against discrimination in employment on the basis of race and religion, and that defendants retaliated

1

against plaintiffs in violation of 42 U.S.C. 1981 and 42 U.S.C. § 2000e-2(a) and other laws.

## II. Jurisdiction and Venue

1. Plaintiffs invoke the jurisdiction of this Court pursuant to 29 U.S.C. § 621 *et seq*, and 28 U.S.C. §§ 1331 and 1337, and 42 U.S.C. § 2000-e et seq.. The matter in controversy arises under an act of Congress regulating commerce and relating to race discrimination. Supplemental jurisdiction over the state law claims is conferred by 28 U.S.C. § 1067.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the Defendant was doing business in this district, and the activities giving rise to the plaintiffs' claim took place in this district.

3. Plaintiff timely filed charges of discrimination and retaliation in violation of Title VII, with the EEOC and files this suit within 90 days of the receipt of the right to sue letters received by each.

## III. Parties

4. The Plaintiff, Jeffrey A Kantor, (hereinafter "Kantor") is a Jewish -American citizen of the United States.

5. The defendant, Solution Technology Systems, Inc. (hereinafter "STSI") is a government technology contracting company based in Arlington, Virginia.

## IV. - Facts

6. Prior to being employed at STSI, Plaintiff Kantor was employed by Appian Corporation from April, 2009 until April, 2011, when he was terminated.

7. Kantor worked the entire time as a contractor for the Army at Fort Belvoir, Virginia on the Army Knowledge Online and Defense Knowledge Online systems. Northrop Grumman was the prime vendor. CRGT was the sub-contractor under Northrop Grumman. Appian Corporation ("Appian") was a sub-contractor under CRGT.

8. In October of 2009, Kantor used the search engine Google to try to find, "How do I build a radio controlled airplane." He ran this search a couple weeks before the birthday of his son with the thought of building one together as a birthday present. After typing, "how do I build a radio controlled" Google auto-completed his search to "how do I build a radio controlled bomb." This year (in 2013) in response to the Eric Snowden leaks, the government declassified the PRISM program, in which the government admitted to having back door access to Google's servers to search for signs of terrorism.

9. Kantor was studying chemistry at the time at George Mason University. Kantor was taking the courses in anticipation of applying to medical school. He was therefore concerned about the possibility that the Google search in conjunction with his studying chemistry at GMU might result in some type of government investigation.

10. The Google search occurred over a weekend. The following week, all of the other workers in Kantor's area met with government investigators. The coworkers in his cubicle area were Stephanie Buchner and Qem Lumi, who worked for Northrop Grumman, JR Ector and Li Min, who worked for CRGT and Tony Nemil, who worked for a company that was a sub-contractor to Northrop Grumman.

11. After the meeting between the government investigator and all of the other members of Mr. Kantor's work area, Stephanie Buchner, of Northrop Grumman, said within earshot of Kantor, that the meeting

was really strange and that she couldn't believe it, but she would not tell Kantor the details of the meeting.

12. All of the members of Kantor's work area started pretending to be interested in Kantor's hobbies and interests with one exception: Tony Nemil started making a series of anti-Semitic comments. Kantor is Jewish. This seemed to be a good cop bad cop approach. The EEOC finding states that it was only one incident, however, Tony Nemil made anti-Semitic comments repeatedly over the course of five months of sitting next to Kantor, who was one of the few Jewish contractors at the Army Knowledge Online project.

13. In October of 2010, Kantor's manager at Appian, Mike Kang, made a statement that implied that Kantor was under investigation and that Northrop Grumman employee Stephanie Buchner was filling out investigation reports on him.

14. In January of 2011, Kantor complained to the Anti-Defamation League about what he perceived as the government's use of anti-Semitism as an investigation technique. Kantor told Stephanie Buchner that he had filed the complaint with the Anti-Defamation League and verbally accused Stephanie Buchner of being involved with what was going on including Tony Nemil making the anti-Semitic remarks.

15. Later that day, Stephanie Buchner's manager, Deborah Daniels told Kantor that Stephanie Buchner had told her about what he said and that Kantor needed to talk to his own management at Appian about it.

16. Kantor then became the target of vicious group stalking (also commonly referred to as gang-stalking) at the hands of Northrop Grumman and CRGT personnel. Every day at two o'clock his

coworkers would repeat back his private information and then talk for an hour about how people dropped dead from stress and hypertension.

17. If Kantor ever got angry after his private information was repeated back (by slamming a cabinet or typing loudly on his computer), the CRGT and Northrop Grumman employees would tell the same story about how there was a neighbor in their community who seemed like such a nice guy, but then went on a murder-suicide. If Mr. Kantor stayed calm after they repeated back his private information, they would instead spend the hour talking about how people drop dead from hypertension. This happened every day for almost three months.

18. Every time Kantor walked to his cubicle during his last two weeks on the army knowledge online project, an African-American woman would say as he passed, "He has been here two years and he won't quit." Kantor had been on the project two years. This happened every time Kantor walked to his desk, which was multiple times a day.

19. The final week before Kantor requested that Appian transfer him to another project, the stalking started occurring outside of work. Two days before Kantor requested to be transferred; he drove to a park area of Fort Belvoir after work. He hiked on a trail and returned to his car, which was in an isolated area (where no one normally parks). There was a van next to his car and there were three men. As Kantor returned to his car, one man says to the other, "He has been here two years and he won't quit. I guess he is trying to prove a point." Kantor was able to ignore the group stalking that had occurred at his office up until this point, but was very concerned that being followed outside of work represented a whole new threat level. It was at this point that he decided to ask Appian management to transfer him to another project. He also consulted with his father, an attorney in New Jersey, who advised Kantor to specifically mention to Appian that the harassment included anti-Semitism.

16. All of the people participating in the group stalking that Kantor knew of were CRGT and Northrop Grumman personnel, with one exception. His manager, Mike Kang had participated in one occasion in the group stalking. Kantor had driven to lunch with his Appian manager, Mike Kang. Mike Kang asked Kantor what movies his wife likes. Kantor answered and politely asked Mike Kang what movies his wife likes. Kang stated that his wife likes "the Girl with the Dragon Tattoo" and the "Harry Potter" movies. Kantor thought that this was strange since at the time the only version of "the Girl with the Dragon Tattoo that existed was in Swedish and Harry Potter was a kid's movie. Kantor also thought this was disturbing because those were the exact two books that he was reading. The second book Kantor was reading to his son. When Kantor returned to his office, the CRGT manager, Tony Buzanca, immediately asked Kantor what books he was reading, smirked, and walked away not waiting for a response.

17. This same CRGT manager, Tony Buzanca, had repeated back Kantor's private information on numerous other occasions. He would typically repeat back his private information, smirk, and then walk away not waiting for a response. The private information that he would repeat back would typically be very sensitive things that Kantor did not want to publicly discuss or disclose. Kantor did not know how Tony Buzanca or the other Northrop Grumman and CRGT employees gained access to his private information.

18. Kantor does not know and may never know the exact purpose behind this harassment. Kantor suspects that it was being done in retaliation for his reporting the use of anti-Semitism as an investigative technique to the Anti-Defamation League. Kantor has subsequently filed FOIA/PA requests with the FBI, the NSA, and the Army, and they were all denied. At the time that Kantor complained though, he had information from his Appian manager that it was an investigation, and the CRGT manager had implied that everyone in his cubicle area was in on it together, which implied that

Tony Nemil, who made the anti-Semitic comments, was also in on it.

Kantor filed the FOIA requests in 2011 while working for STSI. He did so on his own time outside of the office. Kantor had the FOIA requests notarized. He then mailed in the FOIA requests to the FBI, the NSA, and the Army. Three days after mailing in the requests (about the time it takes mail to arrive and for the requests to work their way through the chain of command), his STSI manager, Gary Waymire, asks Kantor a question that he already knew the answer to. Kantor was perplexed why his manager was asking him a question that he already knew the answer. Kantor calmly and respectfully answered Waymire's question. Waymire then responded, "Hey, I believe you. You don't have to get it notarized." Kantor had never heard that expression before or since in his entire life. This was designed to clearly demonstrate to Kantor that the machinery was all working together synchronously. When Kantor ultimately received the responses to his FOIA requests, they were all denied.

19. Kantor had overheard CRGT employees talking about him in the restaurant inside the engineering compound at Fort Belvoir. Kantor had never disclosed to anyone he worked with that he was planning on applying to medical school. They said that Kantor was applying to medical school, he thought that everyone was out to get him, and that the trunk of his car was being searched for an AK-47. At the time someone was shooting military targets in the Northern Virginia area including the Pentagon, the Marine Corps museum, and a Marine Corps recruiting station in Chantilly, Virginia. At the time, FBI profilers were publicly stating that the suspect was someone with ties to the military that had a grudge against the military. Kantor worked as a contractor for the military; however, he has no grudge against the military other than the harassment that occurred. In fact, Kantor worked tirelessly to help the military on the AKO project. Kantor was literally on call 24/7 and received support calls around the clock – day and night – and always provided support. The person in this shooting later turned out to be a disgruntled marine. Kantor's manager, Mike Kang, asked Kantor numerous times about these

shootings as they were occurring.

19. Kantor complained to Appian on Wednesday morning after having been followed after work on Monday and Tuesday. Chris O'Connell, a director in charge of Appian's federal consulting division told Kantor initially that he would reassign him to another project. Kantor was interviewed by Chris O'Connell and the Appian Human Resources Manager. Kantor met Chris O'Connell on Thursday and turned in his army security badge. Kantor was scheduled to take a vacation day on Friday.

20. The following Monday when Kantor went to report to Chris O'Connell's office at Appian's Reston headquarters, Kantor was terminated. Kantor was told that he had requested to work on a non-DOD project (because he felt he was being harassed) and they did not have any open positions on a non-DOD project.

21. Kantor then asked to be assigned to the other DOD project that was not with the army, which he was told had openings. He was told that they couldn't assign Kantor to another project since he felt that there was a government conspiracy against him. The EEOC had found that Mr. Kantor refused work; however, this is not accurate. It is true that Kantor had initially asked to be transferred onto a non DOD project (since he was being harassed), however Kantor asked to be assigned to a different DOD project when he was told that there was no other work available.

22. After firing Kantor, Appian director Chris O'Connell escorted Kantor out of the building. O'Connell said to Kantor that he could have transferred Kantor to another project if Kantor had quietly come to him and not mentioned harassment. But because he made allegations of harassment and because Kantor had included Appian upper management in the transfer request, O'Connell could not transfer Kantor to another project. O'Connell then said that the word "harassment" has legal connotations. O'Connell's statement was almost the textbook definition of retaliation for reporting

harassment.

23. Kantor met with attorneys at Albo and Oblon in approximately June of 2011, while he was an employee of STSI. His purpose in hiring the attorneys at Albo and Oblon was to sue Appian corporation for being fired after reporting discrimination. The attorneys advised Kantor to file a complaint with the EEOC.

24. Kantor called the EEOC on his cell phone to file his complaint. He did so in his car on his way to work at STSI's office in Arlington. When he got to work, his STSI coworker appeared to be repeating back portions of his cell phone conversation with the EEOC.

25. In October of 2011, Kantor was moved onsite to the EPA's headquarters in Washington DC. As Kantor continued to work on his case, he became the target of non-stop group stalking at the hands of his coworkers. His coworkers would repeat back his private information, including websites that he went to on his own time from his home computer, the contents of phone calls that he had outside of work on his cell phone, emails that he sent to his attorney from his home computer on his personal email account, and conversations that he had in his house with his family.

26. If Kantor ever got angry and slammed a desk drawer or typed loudly on his computer, his STSI coworkers would repeat back the exact same catch phrase that his coworkers at the army repeated back after his private information was repeated back. His coworkers would immediately say, "We have this neighbor in our community who seemed like such a nice guy, but then he went on a murder-suicide."

27. In late December 2011, Kantor's coworkers all engaged in group stalking against Kantor by repeating back his private information (as they had done dozens of times in the past) and his manager then said that there was a person who dropped dead after going on a roller coaster. He said the person

didn't drop dead that day, but they dropped dead a few days later. Kantor's coworkers at the army used to also talk about how a person dropped dead after repeating back his private information. Now, his coworkers at STSI were repeating back his private information and immediately saying that there is a person who drops dead. Kantor complained to the FBI. Kantor alleged that this was a violation of his civil rights and that it was tantamount to a death threat. The FBI contacted the EPA. The EPA contacted Kantor. STSI management demanded that Kantor explain his actions of reporting to the FBI that STSI manager, Gary Waymire, had made a death threat. Kantor refused and said that any conversation that he had with the FBI was private. Kantor was sent home. The Vice-President of STSI called Kantor at his house that afternoon and informed him that he was being fired. Kantor recorded this conversation and told the Vice-President that the conversation was being recorded.

## V. Count One

### Violation of 42 U.S.C. § 2000e-3

### Retaliation for reporting Racial/Religious Discrimination

### Against Appian Corporation

25. The allegations of each of the foregoing paragraphs are incorporated herein as if realleged.

26. STSI is an employer subject to Title VII under 42 U.S.C.A. § 2000e(b), having 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and/or the agent of that person.

27. Plaintiff suffered adverse employment action which was causally connected between the plaintiff's actions and the harm suffered.

28. Aforementioned acts and utterances by Defendants were ultimately made because of Plaintiff's expressed opposition to earlier discriminatory acts and utterances.

29. Aforementioned acts and utterances by a sub-contractor of Northrop Grumman, were made with and are based upon racial and racist animus, and constituted unlawful discrimination based on Plaintiff's religion. By repeating back Kantor's information related to I) the call to the EEOC II) the FOIA request, which was made at the advice of counsel to obtain information to his discrimination case against his former employer and III) the repeating back of the contents of his email to his attorney, which was in regards to the discrimination case the defendant engaged in behavior that was retaliatory for reporting discrimination.

38. As a result of Defendants' discriminatory actions, Plaintiff has suffered lost income and lost wages.

39. Plaintiff is now suffering and will continue to suffer irreparable harm and injury as a result of Defendant's policies, practices, customs and usages as set forth herein.

40. As a direct result of Defendant's discriminatory and wrongful acts as set forth herein, Plaintiff has suffered lost wages, income and expenses, emotional distress, humiliation, embarrassment and mental anguish.

**WHEREFORE**, with respect to Count 1, the plaintiff respectfully pray that this Court:

a. Issue a declaratory judgment that the defendant's acts, policies, practices and procedures complained of herein violated the plaintiffs' civil rights as secured by 42 U.S.C. §§ 1981, 1985, 1986 and 2000e *et. seq*; and the First Amendment of the United States Constitution; and

b. Order the defendants to make whole the plaintiffs by providing appropriate back pay and other benefits wrongly denied in an amount to be shown at trial and other affirmative relief;

c. Enjoin further race and religious discrimination by the defendants and restrictions and violations of plaintiffs' First Amendment rights;

d. Grant plaintiffs their attorney's fees, costs and other disbursements; and

f. Award compensatory, punitive, and liquidated damages in the amount of $45,000,000.00 or such greater amount as may be proved at trial or such other sum as the law may provide; and

e. Award front pay if appropriate in an amount to be proved at trial; and

f. Grant such additional relief as the Court deems just and proper.

**A TRIAL BY JURY IS REQUESTED**

Dated: This 28th day of October, 2013.

Respectfully submitted,

_____
Stephen Christopher Swift
Virginia Bar No. 38419

Swift & Swift, Attorneys at Law, P.L.L.C.
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314-4688

Telephone: (703) 418-0000
Facsimile: (703) 535-8205
E-Mail: steve@swift.law.pro

*Attorneys for Plaintiff Jeffrey Kantor*